WILLIAM M. REESE and CATHOLEEN REESE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reese v. Commissioner
Docket No. 2678-72
United States Tax Court
T.C. Memo 1976-275; 1976 Tax Ct. Memo LEXIS 128; 35 T.C.M. (CCH) 1228; T.C.M. (RIA) 760275; August 30, 1976, Filed Milan L. R. Wade, for the petitioners. John D. Copeland, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent has determined deficiencies in the petitioners' Federal income tax for the taxable years 1967 and 1968 in the amounts of $35,197.56 and $67,612.20, respectively. Concessions having been made by the parties, we must determine whether petitioners are entitled to: 1. deductions for travel and entertainment expenses for the years 1967 and 1968 2. a deduction for interest paid in 1968 3. deductions for payments to Industrial Instrument Corporation representing *131 profits from sales of stock of that corporation 4. deductions for net operating losses attributable to 1969 and 1970. Some of the facts have been stipulated and are found accordingly. Petitioners William M. Reese and Catholeen Reese, [1] resided in Dallas, Texas at the time the petition was filed in this case. During the years 1967 through 1969 and part of 1970, petitioner was president, treasurer, chairman of the board of directors, and a principal stockholder of Industrial Instrument Corporation (IIC). IIC, a corporation organized under the laws of the state of Texas, has engaged in the manufacture and sale of mechanical measuring devices, such as instruments and gauges. Issue 1 Travel and Entertainment Expenses
FINDINGS OF FACT Petitioner incurred expenses which are claimed as travel and entertainment expenses in 1967 and 1968. The record contains lists of these expenditures showing the date, amount paid, and the payee. Notations on the check cryptically describe the nature of the expense *132 ("travel insurance", "hotel", "passport", "ticket") without any further indication that the expense was incurred for business rather than personal purposes. OPINION Petitioner contends that the travel and entertainment expenses which he incurred are deductible as ordinary and necessary business expenses. Section 162(a)[2] provides a deduction for ordinary and necessary business expenses incurred in carrying on a trade or business and specifically allows a deduction for traveling expenses so incurred. Petitioner must, however, prove that the expenses were primarily motivated by business rather than personal considerations. Buddy Schoellkopf Products, Inc., 65 T.C. 640 (1975). Moreover, since the disputed expenses are travel and entertainment expenses, petitioner must meet the substantiation requirements of section 274 and the regulations promulgated thereunder. *133 Section 274 requires that each element (amount, time and place, business purpose and business relationship) of the expenditure be proved "by adequate records or by sufficient evidence corroborating [taxpayer's] own statement." An adequate record of business purpose generally requires a written statement except where the business purpose is evident from the surrounding facts and circumstances. Income Tax Regs. section 1.274-5(c)(2)(ii)(b). Absent adequate records, the taxpayer may establish business purpose by other sufficient evidence--that is by his own statement containing specific information in detail and by other corroborative evidence. Income Tax Regs. section 1.274-5(c)(3)(i) and (ii). Although petitioner has proved the amount and time and place of the disputed expenses, he has failed to substantiate the business purpose in accord with the requirements of section 274. In fact, the only evidence relating to the business nature of the expenses was petitioner's vague blanket recollection that all of the claimed expenses were business related. Clearly, this vague testimony is not the specific and detailed statement *134 contemplated by the statute or the regulations. Furthermore, no evidence corroborating petitioner's very general testimony regarding the business nature of the expenses was presented. Finally, we are for the most part left in the dark about the facts and circumstances surrounding the specific expenditures in issue, so that the business purpose of each expenditure cannot be determined from the surrounding circumstances. Consequently, we must sustain respondent's disallowance of travel and entertainment expenses for the years 1967 and 1968. Issue 2 Interest Deduction
FINDINGS OF FACT In 1968, petitioner paid and deducted $6,583.78 for interest he paid on a note. The payee was the Dallas County Bank and the note is on a form apparently used by the payeebank.The note is made out in the name of Industrial Instrument Corporation, and is signed "Industrial Instrument Corporation, W. M. Reese, President." OPINION Section 163 provides a deduction for interest paid or accrued on an indebtedness within the taxable year. The interest must be paid or accrued on a valid obligation of the *135 taxpayer claiming the deduction. Arcade Realty Corporation,35 T.C. 256 (1960). P. P. Griffin,7 B.T.A. 1094 (1927). The sole issue with respect to the interest in this case is whether the underlying obligation constituted an indebtedness of IIC or of petitioner. Petitioner contends that despite the fact that the note reflecting the indebtedness was made out in the name of IIC and was executed by him in his capacity as president of IIC, he received the proceeds for his personal benefit and repaid both the principal and interest from his personal resources. Although it is clear that petitioner paid the interest on the loans, that fact is not determinative of either the liability on the note or the availability of the interest deduction. The note was executed by petitioner in a representative capacity and thus subjected the corporation to liability for default. Tex. Bus & Commerce Code sec. 3.403 (1968). No evidence other than petitioner's very general testimony supports the conclusions that the indebtedness was other than a corporate obligation. Since the interest was paid on an obligation of another, petitioner is not entitled to an interest *136 deduction under section 163. The interest payments were rather contributions to capital which increased petitioner's losses in the IIC stock. [3]
Issue 3 - Payments to or on behalf of IIC
FINDINGS OF FACT In 1967 petitioner sold 72,287 shares of IIC common stock for a gross sales price of $184,195.20 and a long term capital gain of $111,593.20. In 1968 petitioner sold 60,465 shares of IIC common stock for a gross sales price of $332,352.32 and a long term capital gain of $254,109.32. In 1967 and 1968 petitioner made payments to or on behalf of IIC in the amount of $99,782.79 and $199,043.81, respectively. [4] No demand was ever made nor was any suit ever filed against petitioner by IIC or by any person acting on its behalf to recover profits derived by petitioner from his dealings in IIC stock. *137 During IIC's fiscal year ended November 30, 1967 the company required operating capital and arranged for a loan of $350,000 to meet this need. One hundred thousand dollars was advanced but the lender failed to furnish the remaining $250,000. IIC had no profit in its fiscal year ended November 30, 1967 and for the 18-month period ended May 31, 1969 incurred an operating loss of $528,388.09. OPINION Petitioner contends that his payments to or on behalf of the corporation were made to avoid liability under section 16 b of the Securities Act of 1934 and consequently are deductible as capital losses. See Anderson v. Commissioner,480 F.2d 1304 (7th Cir., 1973); Mitchell v. Commissioner,428 F.2d 259 (6th Cir., 1970). The record does not, however, support petitioner's theory. Rather, we conclude from the facts that the payments were contributions to capital.
Section 16 b prohibits either a sale and purchase or a burchase *138 and sale of securities within less than 6 months by a corporate insider. Although petitioner qualifies as an insider who did both sell and acquire stock during 1967 and 1968, there is no evidence that any of the transactions occurred within the proscribed 6-month period. [5] Thus, the facts do not indicate any basis for a section 16 b action. Petitioner testified that the possibility of a section 16 b action was raised in a conversation with a staff member of the Securities and Exchange Commission but no other evidence that the conversation occurred was presented.Furthermore, petitioner's theory that the payments were initiated as a result of the conversation is difficult to accept in light of the fact that the payments began almost a year before the conversation which allegedly alerted petitioner to possible violations of section 16 b. We are not persuaded that the payments were motivated by petitioner's desire to avoid any such potential *139 liability. No correlation between the amount of the payments and petitioner's potential liability was demonstrated. No definite amount was determined to reflect the liability but rather petitioner made adhoc payments for ordinary operating expenses such as rent, salary, and payments to creditors. The payments were periodic responses over a considerable period of time to specific financial problems of IIC. The nature of the payments combined with the poor financial condition of the corporation reinforces the conclusion that the payments were designed to insure the continued operation of the corporation rather than to compensate it for illegally obtained profits. Finally, the petitioner in authorized communications to the shareholders represented the payments as contributions to the capital of the corporation. Thus, it is clear that the payments were not reimbursement for insider profits but were contributions to capital which must be added to the basis of petitioner's stock in IIC. [6]
*140 Any contention that the payments, if not reimbursements for insider profits, were loans to the corporation must similarly be rejected. Whether shareholder advances constitute loans or contributions to capital is a question of fact. Yale Avenue Corp.,58 T.C. 1062 (1972). None of the indicia of a loan were here present. No note evidenced any of the advances. No security was given. No provision for repayment was made and no agreement regarding interest or a due date was executed. Moreover, the corporation required operating capital and the advances were made to pay current operating expenses. We are, therefore, compelled to conclude that under the circumstances the payments were contributions to capital. Issue 4 - Net Operating Loss Deductions
The parties agree that the net operating loss deduction for 1967 and 1968 attributable to net operating losses incurred in 1969 and 1970 requires us to determine: A) whether certain unreimbursed business expenses in 1969 and 1970 have been substantiated; B) the amount and proper year for deduction of a nonbusiness *141 bad debt; C) the basis of stock and the year it became worthless, and D) the nature of a loss on a foreclosure sale of a partially completed building. A. Unreimbursed Business Expenses for 1969 and 1970 FINDINGS OF FACT
On petitioner's 1969 return, he deducted the following items, totaling $23,056.81, as "unreimbursed business expenses": Telephone calls charged to home telephone for
I.I.C. business
$ 498.94
Travel expenses for I.I.C. (includes gasoline
expense which was not reimbursed)
843.43
Payments made to Dallas Bank & Trust Co. on
note for I.I.C. truck
142.39
Unreimbursed legal expense paid for I.I.C. to
Childress, Port, & Grady for work done for
I.I.C. in connection with loan from Texas
National Bank of Commerce, Houston, Texas
8,704.45
Unreimbursed interest expense paid to Texas
National Bank of Commerce for I.I.C. note
8,901.90
Rent paid for I.I.C. plant in Austin. Paid
to Nash & Cox.
3,597.70
Legal fees paid Bonham, Stanley & Campbell in
connection with loan from Texas National Bank
of Commerce to I.I.C.
368.00
Total expenses unreimbursed from Industrial
Instrument Corporation
[7]$23,056.81 *142 The deductions for unreimbursed legal expenses, unreimbursed interest expense, and rent paid for the IIC plant in Austin, Texas, resulted from the following transaction. In 1957 petitioner purchased 6-1/2 acres of land in Austin, Texas, and worked out an arrangement with Nash & Cox, to whom the land was sold at no profit, and in return Nash & Cox agreed to construct a building for IIC and lease it to the company for 15 years. Petitioner reserved an option to purchase the building at a fixed price at any time during the term of the 15-year lease. In 1969, petitioner arranged to sell the property to a third party, and petitioner therefore exercised the option to buy from Nash & Cox. Prior to this sale IIC had borrowed some funds from Texas National Bank of Commerce in Houston, Texas. To assist the corporation in securing this loan petitioner had pledged his option. At the time the option was exercised in 1969 and the property sold, there was approximately $40,000 in principal still due on the corporation's note. From the closing receipts of $186,073.65, the title company paid the following amounts: To Howard Cox and James P. Nash as
$ 3,592.70
rent
Texas National Bank of Commerce
50,606.35
Morgan Pierce, Attorney fee
5,646.22
*143 Of the amount of $50,606.35 paid to Texas National Bank of Commerce, $8,901.90 represented interest. Respondent disallowed the entire $23,056.81 deduction as not being business expenses and for lack of substantiation. However, the parties have stipulated that the last five items listed are deductible only as nonbusiness bad debts to the extent substantiated. OPINION Petitioner introduced no evidence to substantiate the first, third, or final item on the list (telephone calls, payment on IIC truck note, legal fees to Bonham, Stanley, and Campbell), and we sustain respondent's determination as to these items. Moreover, the evidence offered to substantiate travel expenses for 1969 is essentially the same as the evidence offered for 1967 and 1968. We again hold that this evidence falls far short of the substantiation requirements imposed by section 274 and the regulations promulgated thereunder. [8]
Petitioner attempted to substantiate the remaining three *144 items by the introduction of a closing statement showing the distribution of the proceeds due Mr. Reese from the sale of the Austin building; and through the testimony of William Reese, Jr. We find that this testimony, in conjunction with the closing statement, substantiates the payment on behalf of IIC of rent to Cox and Nash of $3,592.70; and the payment on behalf of IIC of $5,646.72 in legal expenses attributable to the loan IIC received from Texas National Bank of Commerce. [9] In accordance with the stipulation of the parties these items are deductible as nonbusiness bad debts in 1969. With regard to the remaining item--$8,901.90 for interest on behalf of IIC to Texas National Bank of Commerce, respondent agrees that the loan was *145 made, that it was outstanding at the time the option was exercised in 1969, and that at that time there was a balance of approximately $40,000 in principal still due on the note. [10] All of this was testified to by Mr. William Reese, Jr., and all but the remaining note balance is suggested by the closing statement. We found the testimony of Mr. William Reese, Jr., to be very compelling on this point, and consistent with the closing statement. [11] Accordingly, we sustain petitioner on this issue, and the $8,901.90 interest paid on behalf of IIC is, in accordance with the stipulation of the parties, deductible as a nonbusiness bad debt in 1969. *146 B. Bad Debt Deduction FINDINGS OF FACT
Petitioner claimed a non-business bad debt deduction of $88,724 in 1969 for loans to IIC. No note or other evidence of indebtedness was executed by IIC in favor of petitioner. [12] No interest rate or repayment schedule was established. The amount of the debt included petitioner's payments to or on behalf of the corporation in 1967 and 1968 which we determined to be contributions to capital, unreimbursed business expenses which we denied for lack of substantiation and rent, salary and interest owed to petitioner. Petitioner's claim for $88,724 was compromised in the bankruptcy proceeding and as a result, petitioner received no reimbursement from the corporation. OPINION The deduction for bad debts provided by section 166 is predicated upon a valid and enforceable obligation which becomes worthless during the taxable year. Income Tax Regs. sec. 1.166-1(c). Thus, we must *147 first determine whether a bona fide debt arising from a debtor-creditor relationship was created. Petitioner submitted a summary of transactions which reflects the component parts of the debt allegedly owing from IIC. At the outset we note that petitioner's payments to or on behalf of the corporation allegedly made in satisfaction of a potential section 16 b [13] liability were in fact contributions to capital and are, thus, not deductible as bad debts. Sec. 1.166-1(c), Income Tax Regs. Some of the items--such as interest, legal fees, and rent have already been allowed, at least in significant part, and are duplicated in this claim by petitioner. Other expenses appear to include unsubstantiated travel expenses. Furthermore, since petitioner has not shown that he included in his income the salary accrued by IIC, he cannot be allowed a bad debt deduction in respect of those items. Sec. 1.166-1(e), Income Tax Regs.
In summary, some of the items are clearly contributions to capital, others involve duplicate claims, and still other items were never included in petitioner's income. To the extent *148 any amount remains (and petitioner's composite exhibit of the items involved is far from clear) we are simply unpersuaded that they represent a debt owed to petitioner rather than a contribution to capital. C. Worthless Stock Deductions FINDINGS OF FACT
On November 26, 1969 petitioner filed a petition on behalf of IIC for an arrangement under Chapter XI of the Bankruptcy Act in the U.S. District Court for the Northern District of Texas. A summary of debts and assets filed with the petition reflected debts of IIC totaling $904,619.86 and assets of $740,863.68 plus four assets of undetermined value. One of the assets of undetermined value consisted of patents, copyrights and trademarks. IIC's balance sheet of May 31, 1969 indicated that the corporation valued its patents, research and development, and other assets at $587,431.79. Another of the assets of undetermined value was a pending lawsuit in which petitioner and IIC, as joint plaintiffs, sought damages in the amount of $800,000. The trustee in bankruptcy declined to participate as a party plaintiff but petitioner ultimately obtained some recovery. On January 30, 1970, petitioner filed a proposed plan of arrangement *149 with the Bankruptcy Court. The plan provided unsecured creditors with the option of receiving the lower of $100 in cash or the amount of the claim; or alternatively, common stock of IIC with a par value of $1 at the rate of 100 percent of the amount of the claim calculated at the rate of $1 per share. The plan was amended on February 6, 1970 to pay unsecured creditors 25 percent of their claim in cash. Neither plan was acceptable to the creditors and on February 19, 1970 an order was entered dismissing the petition under Chapter XI, adjudicating IIC a bankrupt and naming an operating trustee. Several months prior to the filing of the bankruptcy proceedings, petitioner worked out some financial arrangements considered necessary to allow IIC to develop properly, but these fell through due to a stop order placed on IIC stock by the Texas State Security Board and by the Securities Exchange Commission. There was no market for IIC common stock on December 31, 1969, and no brokers were quoting either buy or sell bids. Petitioner received no distribution from the bankrupt estate in respect of holdings of captial stock in IIC. Petitioner's basis in the IIC stock at the time it became *150 worthless was $135,559.76 plus the costs of certain patents transferred by petitioner to IIC in 1954 or 1955. [14]
OPINION Section 165(g) provides a deduction for securities which become worthless during the taxable year. The parties disagree regarding the amount of a worthless stock loss sustained by petitioner and the year during which the stock became worthless. Petitioner contends and respondent agrees that the basis of the stock which became worthless must be increased by the cost of patents contributed to the corporation. The parties, however, have failed to reach an agreement regarding the cost of the patents. Petitioner testified that the cost of these patents was at least $50,000, but that any records which might substantiate that cost were destroyed by the trustee in bankruptcy. Although the record is not as clear as we would desire, we are persuaded after a careful *151 review of the evidence that the cost attributable to the development and acquisition of the patents was $15,000. Cohan v. Commissioner,39 F.2d 540 (2nd Cir. 1930). Having determined the basis of the stock, we must decide the year in which the stock became worthless. That issue presents a question of fact. Boehm v. Commissioner,326 U.S. 287 (1945); Joseph C. Lincoln,24 T.C. 669 (1955). Petitioner must prove that the stock became worthless during the year in which the deduction is claimed. Mahler v. Commissioner,119 F. 2d 869 (2nd Cir. 1941), cert. den. 314 U.S. 660 (1941). Stock is worthless only when it has neither a current liquidating value nor a potential value. Thus, if the corporation's liabilities exceed its assets, the stock is not worthless as long as an expectation exists that at some future time the assets will exceed its liabilities. Only when the expectation is eradicated will the stock be *152 considered worthless. Joseph C. Lincoln,supra; SterlingMorton,38 B.T.A. 1270 (1938) affd. 112 F. 2d 320 (7th Cir. 1940). Respondent argues that the IIC stock had liquidating or potential value as of December 31, 1969. Respondent notes that the schedule filed in the Chapter XI proceedings did not specify a value for four assets, including patents, copyrights and trademarks, and dies and patterns. He also argues that even in the absence of liquidating value, the stock had potential value at the end of 1969, since an effort was being made in the bankruptcy proceedings to revitalize the corporation. Conversely, petitioner argues that at the end of 1969, IIC had ceased to be a viable financial enterprise, that the stock was not being traded, and that market quotes were not being given for the stock. He argues that the events a few weeks later simply confirmed the existing state of facts.
While the issue is not free from doubt, we agree with petitioner that the stock of IIC was worthless as of December 31, 1969. It is clear that the final desperate efforts to stave off creditors at the end of 1969 and prolong the corporate life came *153 to an abrupt end in February of 1970, and not one cent was ever received in respect of petitioner's holdings in IIC stock. Nothing changed during the first month of 1970, except that the death of the patient was formally acknowledged. We believe that the events unfolding in February 1970 simply reflected the circumstances that actually existed at the end of 1969. Petitioner had a deep personal, as well as financial, commitment to the firm that encouraged him to undertake efforts that were doomed to futility, as he reoognized in his testimony concerning the value of his stock at the end of 1969. However, on the basis of the entire record, including petitioner's testimony as to lack of value which we found credible on this point, we believe the events had reached a state of financial futility at the end of 1969 that warrants a determination that the IIC stock was worthless at that time. The sounding of the death knell may have been delayed a few days, but the corporation was beyond resuscitation at the end of 1969. D. Loss on Partially Completed Building
FINDINGS OF FACT Petitioner purchased approximately 24-1/2 acres of land in Addison, Texas. Approximately 18 acres *154 were sold in 1969. In the summer of 1968 construction of a new plant for IIC was commenced on the remaining 6-1/2 acre tract. Petitioner arranged for construction of the building to provide IIC with an economical lease-purchase arrangement without a cash outlay. In an attempt to achieve this goal petitioner contacted several groups of investors about purchasing the building and leasing it back to IIC. Since IIC did not have the capital to build the building and was unable to borrow it, petitioner financed the construction of IIC's new plant with his own funds or with funds borrowed on his own credit. Most of the funds expended on the plant were from petitioner's bank account; some funds paid from the account of Marcan Corporation were contributed by petitioner. Petitioner's total investment in the new plant was $162,081.41 including a $26,000 basis in the land on which it was constructed. In 1969 a creditor obtained a judgment on a note against both IIC as primary obligor and petitioner as a guarantor of that obligation. In 1970, the plant was sold for $25,000 at a sheriff's sale in execution of the judgment against petitioner. The proceeds of the sale were applied to *155 petitioner's liability as guarantor of IIC's note.
Petitioner was not in the construction business nor in the business of selling real estate or developing it for resale. OPINION Petitioner concedes that the $25,000 applied to his liability as a guarantor of the IIC note is deductible only as a non-business bad debt. He does, however, contend that the remainder of the loss is deductible as either a trade or business loss under section 165(c)(1) as or a loss resulting from a transaction entered into for profit under section 165(c)(2).
In order for petitioner to qualify for a loss deduction under section 165(c)(1) the loss must be sustained in a trade or business. It is clear that the taxpayer may be engaged in more than one trade or business. Snyder v. Commissioner,295 U.S. 134 (1935). Whether the taxpayer's activities constitute a trade or business is a question of fact. Higgins v. Commissioner,312 U.S. 212 (1941).
Petitioner was primarily engaged in the business of a corporate executive. Petitioner contends, however, that he was also engaged *156 in another business--that of general contractor in the Addison project. We must consequently determine whether his activities in regard to that project constituted a trade or business.
The term "trade or business" contemplates a regular and continuous course of conduct rather than sporadic or isolated transactions. The amount of time as well as money devoted to the project is also important in determining whether the undertaking constitutes a trade or business. Prior to the Addison project petitioner admittedly had not been engaged as a general contractor nor was he so engaged on any subsequent project. Moreover, the record does not support a conclusion that petitioner did more than provide the financing for that project. In addition, no evidence regarding either the amount of time petitioner devoted to the project or specific tasks performed by petitioner in pursuit of the alleged trade or business was presented. Petitioner was clearly motivated by a desire to make a profit. The profit *157 motive is in itself insufficient to transform financing activities into a trade or business. Thus, the loss is not deductible under section 165(c)(1) as a loss incurred in a trade or business. Nevertheless, since petitioner's primary motive was to obtain a profit, the loss is deductible under section 165(c)(2) as a loss incurred in a transaction entered into for profit. Petitioner's incidental desire to provide IIC with an economical mode of obtaining a new building does not preclude a finding that the petitioner's primary incentive was the desire to make a profit.
Section 165(f) limits the deduction for losses from the sale or exchange of capital assets to the extent such losses are allowed by section 1211 (relating to capital losses) and by section 1212 (relating to capital loss carrybacks and carryovers).Our next inquiry must therefore be to determine whether the Addison project was a capital asset. All property held by the taxpayer is a capital asset unless specifically excluded from the definition of capital asset. Section 1221. Thus, the Addison project is a capital asset *158 unless it falls in one of the five classes of property specifically excluded.
Property held by the taxpayer primarily for sale to customers in the ordinary course of business is not a capital asset. Section 1221(1). Petitioner did not, however, hold the Addison project primarily for sale to customers in the ordinary course of business. The Addison property was purchased and developed in order to provide IIC with a new facility.Petitioner never intended to hold the property for sale to customers at large but rather sought to insure purchase by a group of investors who would agree to lease it to IIC. Clearly, the Addison project was an isolated transaction not one transaction in the course of a business. Therefore, the Addison property does not come within the exclusion provided by section 1221(1). Moreover, the building was not used in petitioner's trade or business and does not, therefore, qualify for exclusion from the definition of a capital asset under section 1221(2). Similarly, the other exclusions provided by section 1221 are inapplicable. [15] Consequently, the Addison project was a capital asset and the loss must be treated as a capital loss. *159 Decision will be entered under Rule 155. Footnotes
1. Since Catholeen Reese is a party to this proceeding only by virtue of having filed a joint return with her husband, William M. Reese will be referred to as petitioner.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.↩
3. The interest payments by petitioner on behalf of the corporation were contributions to capital rather than loans to the corporation.No instrument reflecting an obligation of the corporation to repay the interest was executed. No schedule of payments by the corporation was prepared nor were any amounts paid to petitioner. Finally, no interest rate was established.↩
4. Petitioner made total payments of $106,543.42 in 1967 but he received reimbursement of $6,671.13 from IIC during that year.↩
5. The only dates in evidence are those on which the petitioner exercised some options granted in cancellation of an indebtedness owing to the petitioner from IIC. The exercise of those stock options appears to be exempt under section 16 b.↩
6. The payments must be added retably to the basis of the stock held by petitioner at the time each payment was made. Since the record contains no evidence regarding the number of IIC shares held on any specific date, this must be reflected in the Rule 155 computation.↩
7. Petitioners also claimed section 1231 losses for sales of property in 1969 (which respondent contends are capital losses) but presented little or no evidence which would indicate the nature of any of the property in question. Petitioners appear to have abandoned this claim on brief (except with respect to property located at 5310 Western Hills Drive, Austin, Texas). We therefore sustain respondent's determination that the assets were capital assets and the gain or loss is a capital gain or loss. Moreover, since the record contains little or no evidence contradicting the determination that the Western Hills property was other than a capital asset, we sustain that determination. Welch v. Helvering,290 U.S. 111↩ (1933).
8. The same issue is presented for 1970 as it pertains to the net operating loss deduction. Again essentially the same kind of evidence was offered to substantiate these expenses, and we again make the same ruling.↩
9. These figures are set out on the closing statement, and were explained by Mr. Reese, Jr. Additionally, the rent paid to Cox and Nash, under the circumstances of the record before us, was quite clearly for the Austin building that was the subject of the sale.Respondent apparently recognizes this since he did not object to a requested finding of fact that rent was paid to Nash and Cox from the proceeds of the sale distributable to Mr. Reese.↩
10. In his reply brief respondent stated he had no objection to requested findings of these facts. ↩
11. We note that respondent, while conceding that about $40,000 remained on the principal balance of the loan, contends that "there is no documentary evidence nor was there any testimony in the record to show that any of the $50,006.35 which was disbursed to Texas National Bank of Commerce constituted interest * * *". To the contrary there was testimony on this point consistent with the closing statement disbursements. Having conceded a $50,000 disbursement of which about $40,000 represented principal on a loan, respondent's position that the remainder is not interest becomes untenable on the record before us.↩
12. Petitioner's proof of claim filed in the bankruptcy proceeding indicated that a note had been executed but could not be located.↩
13. Securities Act of 1934↩
14. Although the parties stipulated this amount as the basis of the stock, it must be adjusted to reflect our decision regarding both the interest deduction and the payments to or on behalf of the corporation.↩
15. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- * * *
(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by-- (A) a taxpayer whose personal efforts created such property, (B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or (C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B); (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.↩